ISRAEL AIRCRAFT INDUSTRIES et al., Plaintiffs,

v.

STANDARD PRECISION et al., Defendants.

No. 72 Civ. 5359.

United States District Court,
S. D. New York.

Oct. 26, 1976.

457

Condon & Forsyth by William L. Schierberl and Marshall S. Turner, New York City, for plaintiff IAI.

Fuchsberg & Fuchsberg by Norman Cousins, New York City, for plaintiffs Zohar Landau, Mordechai Muscatel and Hagai Koren.

Mendes & Mount by Dennis C. Murphy and C. Barry Wetherington, New York City, for defendants.

ROBERT L. CARTER, District Judge.

## OPINION

### I

*The Jury Verdict*

This is an action for personal injuries and property damage sustained as the result of the crash of a jet airplane in Israel on January 21, 1970. Plaintiffs are Israel Aircraft Industries, Ltd. ("IAI") the owner of the aircraft, and the three crew members, Zohar Landau, Mordechai Muscatel, and Hagai Koren ("Landau", "Muscatel" and "Koren") all of whom were injured when they bailed out of the jet.[1] Defendants are North American Rockwell Corporation ("Rockwell"), maker of the aircraft, and Standard Precision, a Division of Electronic Communications, Inc. ("SP"), manufacturer of the wing flap actuator, the part alleged to have failed causing the crash.

1. The wives of the three crew members originally were plaintiffs in the action, suing for loss of services incident to the injuries suffered by their husbands. When the court ruled at trial that Israeli law would apply to loss of service claims, these actions were dismissed because Israel does not recognize such a cause of action.

The complaint encompassed causes of action for negligence, breach of warranty, and strict products liability.[2] The defendants counterclaimed against IAI on the ground that modifications by IAI to the wing flap actuator caused the crash.

After trial the jury prorated 65% of the responsibility for the crash against IAI, 35% against SP, and none against Rockwell. The jury also held Rockwell not liable to IAI for breach of warranty. It assessed total damages for the value of the lost aircraft at $860,000. SP's liability to IAI for damage to the lost aircraft was thus held to be $301,000. The jury also awarded damages to crew members for their injuries as follows: Landau—$275,000, Muscatel—$135,000, and Koren—$15,000. Because liability had been established as 65% IAI and 35% SP, when SP paid the crew members $425,000, the total amount assessed, it could then recover 65% of that amount, or $276,250, from IAI.

*Post Trial Motions By IAI*

IAI has now moved, pursuant to Rule 56(b), F.R.Civ.P., for judgment against SP on SP's counterclaim on the ground that long before trial IAI had compensated Landau, Muscatel, and Koren for their injuries in exchange for the execution of a release from liability by each crew member. IAI asserts that these payments, 75,000 Israeli pounds (IL) to Landau, IL 10,000 to Muscatel, and IL 5,000 to Koren, made in exchange for the releases, satisfy in full its liability to the crew members either directly or indirectly. If the crew members are allowed to recover the full amount of their jury verdict from SP, says IAI, they will be paid twice for the portion of their injuries found by the jury to have been caused by IAI, and if IAI must reimburse SP for 65% of the total damages awarded to the crew members, then IAI will be paying twice for its responsibility for injuries to the crew.

IAI argues that in the face of these releases, the crew members can seek recovery only for the equitable share of the injuries not attributable to IAI's actions. IAI asks, therefore, that the jury verdict in favor of the plaintiff crew members be reduced 65% and the counterclaim by SP be dismissed. IAI asks that its delay in asserting the defense of release be excused because attorneys representing it in this action did not previously understand the nature of the releases.[3]

The releases presented to the court are entitled "Deed of Release and Full and Final Accord." The one signed by Landau is dated January 20, 1971; Muscatel's is dated March 1, 1971; and Koren's July 3, 1970. Each recites that the party signing it has received a sum of money "in complete final and full settlement of all my claims and demands against IAI and/or the Ministry of Defense in respect of everything, directly or indirectly, connected with or resulting from the accident. . . ."[4] and that the money received "includes full, final and complete satisfaction of all damages and/or losses of any kind or nature which have been caused to me and/or may be caused to me at any time, both directly and indirectly, as a result of the said accident." The releases recite further that in consideration of

---

**2.** Initially the action was brought on behalf of all plaintiffs except the Korens. An amended complaint was subsequently filed on behalf of all plaintiffs. Both complaints were signed by William L. Schierberl of the law firm Condon & Forsyth. Norman Leonard Cousins of Fuchsberg & Fuchsberg later took over the representation of the individual plaintiffs. Exactly when this change took place is not clear since Cousins never filed a motion to be substituted as counsel of record. Both defendants have been represented throughout by Dennis Murphy of Mendes & Mount.

**3.** "The only reason the Releases were not raised earlier was that the U.S. counsel for Israel Aircraft Industries, Ltd. and, apparently, counsel for the crew members as well as defense counsel were unaware of the fundamental difference between the law of Israel and the law of New York, which permits direct actions by employees against their employers." (Reply Memorandum of IAI, at pp. 8–9)

**4.** The releases vary slightly in ways not material to the disposition of these motions. In this instance, Koren's release mentions the State of Israel as an additional party released.

the funds received, the crew members waive and release all claims against IAI and the Ministry of Defense.[5] The releases conclude:

"6. It is known to me that IAI agreed to pay to me the amount of IL [with the appropriate amount recited] only based upon my above confirmation and statement." [6]

Below the signature of each plaintiff crew member is a signed statement by an attorney for IAI stating that he "read and thoroughly explained" the contents of the release to the person who signed it.

*Post Trial Motions by SP*

SP has cross-moved to amend its answer pursuant to Rule 15(d), F.R.Civ.P., to assert the defense of release and for judgment against plaintiff crew members. According to SP, under Israeli law at the time the releases were signed, the release of one tortfeasor by an injured party released all tortfeasors.[7] SP argues that it should be allowed to amend its answer even after trial and a jury verdict because during pretrial discovery IAI and the crew members failed to disclose the releases, despite SP's reasonable attempts to ascertain their existence. Moreover, SP contends there was no valid excuse for IAI's delay in asserting, as an affirmative defense to SP's counterclaim, that the crew members had released it from liability. Further, SP characterizes the failure to disclose and the concealment of the releases as a fraud upon the court necessitating judgment for SP against IAI and the crew members.

SP details various steps taken to discover all the facts relating to the relevant issues in this lawsuit. A notice for production of documents, served on plaintiffs on behalf of defendants included the following request:

"11. All personnel records of the individual plaintiffs which are in the possession or control of ISRAEL AIRCRAFT INDUSTRIES, LTD., including but not limited to payroll, medical, hiring, training and work of the individual plaintiffs as employees of said ISRAEL AIRCRAFT INDUSTRIES, Ltd."

At a meeting between the attorneys for defendants and for IAI, the following interchange occurred:

"MR. FITZSIMONS [for the defendants]: Do you have anything at all to produce with respect to item No. 11 calling for the personnel records of the individual plaintiffs?"

"MR. SCHIERBERL [for plaintiffs]: Not at this time. We are obtaining those records and as soon as we have them I will give them to you." Transcript of Meeting of January 10, 1974, at pp. 120–121.

In spite of the request and the assurance, the releases were not included in the materials turned over to defendants.

During the deposition of plaintiff Muscatel, the following discussion took place:

"Q. Can you tell us what the 10,000 pounds lump sum payment you received from IAI represented?

A. I think there was an agreement between me and I.A.I. to get that sum of money because of what happened to me.

---

5. Paragraph 3 of Landau and Muscatel's release reads as follows:

"3. In consideration of the receipt of the amount, I herewith waive all my claims and demands and contentions, including waiver of any insurance monies which might be payable to IAI and/or the Ministry of Defense under any policy of insurance or agreement of insurance, in respect of my above mentioned injury and disability, in connection with the damages and/or losses resulting from the said accident and I hereby release IAI and/or the Ministry of Defense and/or anyone of them and/or any other person or legal body in their name and/or in their stead, from any responsibility and/or liability whatsoever in connection with the said accident."

Again, in ways not relevant here, the language in the release signed by Koren varies somewhat from the language quoted above.

6. The appropriate amounts are: Landau—IL 75,000; Muscatel—IL 10,000; and Koren—IL 5,000.

7. At present under Israeli law a release of one tortfeasor will not release all tortfeasors if the intention to pursue claims against the others is expressly stated in the release.

Q. Does the sum of money have some relationship to—let me withdraw that. Was this money paid to you as a result of your injuries sustained in this accident?

A. Yes.

Q. Pursuant to the agreement between yourself and I.A.I., this money must be repaid to them out of any you might get as a result of this lawsuit?

A. Yes."

Deposition of Muscatel, July 24, 1974 at p. 40.

SP argues that the answer to the last question was false and misleading. The releases contain no language requiring repayment. SP maintains that the statement that the money was paid pursuant to such an agreement, led it to believe that the payments were in the nature of workman's compensation, which would not require a release and which would not bar or limit an action against a party other than the employer.[8]

While the crew members and IAI were still represented by Condon & Forsyth, the following interrogatories were asked by SP relating to crew members Muscatel and Landau:

"12. Details of any injury payments made by IAI.

13. Whether or not any of the above-mentioned payments are taken into account and deducted from damages under Israeli law."

(Israel Aircraft Industries, Limited, Re: Accident to Jet Commander 029 on January 29, 1970. List of questions relating to Mr. Zohar Landau and Mr. Mordechai Muscatel, 13th September, 1972.)

Muscatel responded:

"12. Payment made by IAI IL 10,000.—

13. ..... [P]ayment per para. 12 is not a question of law since it was an ex gratia grant; it was now agreed that in case Mr. Muscatel's action is successful, he will refund this grant out of the proceeds."

(Re: Accident to Jet Commander 029 on 21.1.1970, Mordechai Muscatel at p. 1.)

Landau's answer was:

"12. Injury payment and reparation for loss of future income of the amount of IL 75,000 were made by IAI.

13. . . . The payment made by IAI is not subject to law as it was an ex gratia payment; it was agreed that in case the present action succeeds, it will be refunded to IAI out of the proceeds."

(Re: Accident to Jet Commander 029 on 21.1.70, Zohar Landau, at p. 1.)

SP argues that the releases show that the payments were not ex gratia or gratuitous. Rather, says SP, the money was given for full consideration, i. e., the execution of deeds of release.

Counsel for the crew members argues that IAI should be estopped from asserting the defense of release at this time. He now argues that the releases be declared invalid for a variety of reasons. For example, counsel states the agreements were contracts of adhesion, and that they were drawn in a manner that does not reflect the parties' true desires.[9]

8. IAI and SP make reference to additional agreements between IAI and the crew members, to which Muscatel may have been referring here. Under these alleged agreements, IAI would finance this lawsuit on behalf of itself and the crew members, subject to reimbursement of its expenses and of the original payments to the crew members if the action proved successful. Yet, even if Muscatel was confused about which agreement he was being questioned, which has not been contended, no step was ever taken to correct the false and misleading impression given to the defendants in his deposition of July 24, 1974.

It should be noted that these agreements have not been submitted to the court and are not referred to by any sworn affidavits. They are, however, referred to by Dr. David Hermann, retained by IAI as counsel, in his unsworn affidavit, at p. 4. IAI having submitted this affidavit, it can make no complaint if the court considers it in rendering this opinion.

9. At various points in the memoranda submitted to the court by Cousins on behalf of Koren, it is stated that this crew member denies signing a release. (Memorandum, pp. 25, 30, 31.) At other points in the memoranda, it is admitted that Koren signed such a release. (Memorandum at pp. 23, 33; Supplemental Memorandum at pp. 3, 6.) No sworn affidavit, however, was submitted by Koren denying that he has signed a release. Nor has counsel even submitted his own sworn statement clearly setting forth Koren's position. Since the signed

## II

*Plaintiffs Cannot Now Profit From Disclosure of the Releases*

■ The defenses that counsel seeks to assert on behalf of the crew members must be based on a factual predicate not present in this case. This court cannot conclude, absent sworn affidavits from counsel or from the plaintiffs themselves that, for example, any crew member was pressured into signing the release or that he did not understand the import of its terms. Were it necessary to determine the validity of the releases, the court would have received no help from plaintiff crew members by way of factual elaboration. The court does not, however, need to reach the validity of these releases in disposing of these motions. Their validity has not been factually controverted, and the releases have been kept secret too long by plaintiff crew members and by IAI to allow the parties secreting the releases to put their validity in issue at this juncture of the litigation.

Plaintiff crew members chose to bring this suit without mentioning the releases, and without asking the court to determine their rights under these agreements. They followed this theory through three years of litigation and nearly five weeks of trial before a jury. It is now too late in the day to alter their theory of the case. Had the releases been disclosed in a timely way, it would have been incumbent upon the court to determine their validity and effect under Israeli law. Indeed, it is possible that the time spent on this case would have been drastically reduced had the existence of the releases been known. Certainly the jury verdict would have been affected by knowledge that IAI had been given full release by the crew members in consideration for payment of a sum of money. In *N.A.A.C.P. v. Alabama,* 360 U.S. 240, 243, 79 S.Ct. 1001, 1003, 3 L.Ed.2d 1205 (1959), the United States Supreme Court rejected Alabama's attempt to restructure its argument after a lengthy period of litigation had already ensued, stating:

"[The State] now for the first time here says that it 'has never agreed, and does not now agree, that the petitioner has complied with the trial court's order to produce with the exception of membership. The respondent, in fact, specifically denies that the petitioner has produced or offered to produce in all respects except for lists of membership.' This denial comes too late. The State is bound by its previously taken position . . . .."

Similarly, it is now too late in this case for the crew members to argue for the first time that the releases are invalid, that they only release IAI, or that they were not signed voluntarily.

It is also too late for IAI to unearth the releases as a basis for dismissal of SP's counterclaim. IAI's lame excuse that its attorneys in New York did not understand the meaning of instructions drawn by its attorneys in Israel cannot justify its failure to disclose the releases as affirmative defense to SP's counterclaim. Even had a different conclusion been reached in respect to the crew members' claims, IAI would nevertheless be barred from using the release as a defense at this time. *See* Rules 8 and 12, F.R.Civ.P.

*Rule 37 Warrants Dismissal of Plaintiffs' Claims*

■ The releases should have been produced by IAI in response to SP's request to produce number 11. Additionally, Muscatel's deposition answers betray a lack of candor that cannot be tolerated of a litigant. The same is true of Muscatel's and Landau's answers to defendants' interrogatories, noted above. Since the answers of Muscatel and Landau to questions were evasive or incorrect, each response may be treated as a failure to answer. Rule 37(a)(3), F.R.Civ.P. The court has the power to dismiss all claims solely on the ground of failure to make proper responses to de-

original of the release is now part of the record, the court takes Koren's failure to submit an affidavit giving his version of the facts to con-

stitute an admission that he signed the release as submitted. *See* Rule 56(e) F.R.Civ.P.

fendants' pre-trial discovery efforts. Rule 37(b)(2)(C), F.R.Civ.P.

■ Ordinarily, sanctions for failure of a party to respond to an opponent's discovery requests are not appropriate absent an existing court order to provide or permit discovery which has been disobeyed. Rule 37(b)(2)(C); *see United States v. Mensik,* 381 F.Supp. 672, 680 (N.D.Ill.1974); 8 Wright and Miller, *Federal Practice Procedure,* § 2284, at p. 764. Yet, the protections and sanctions in the Federal Rules are not absolute and contemplate the use of judicial discretion in fashioning a broad range of remedies and procedures by which compliance with the discovery rules may be enforced. *Marshall v. Ford Motor Co.,* 446 F.2d 712 (10th Cir. 1971); *B. F. Goodrich Tire Co. v. Lyster,* 328 F.2d 411 (5th Cir. 1964); Wright and Miller, *Ibid.* The facts of this case warrant the exercise of such discretion and a deviation from the general interpretation of Rule 37.

Defendants had no way of knowing what information and documents were being withheld, and thus could not have made the appropriate Rule 37 motion normally a prerequisite to court sanction under that rule. Moreover, to a large degree it was the misleading and inaccurate statements by plaintiffs that kept defendants from making any such motion. The sanctions under Rule 37 were provided to prevent just the sort of developments in litigation that occurred here. Under these circumstances, sanctions against plaintiffs are appropriate even though there has been no violation of a specific court order to disclose particular information.

*Fraud was Perpetrated on the Court Necessitating Sanctions Against Plaintiffs Under Rule 60(b)*

■ Rule 60(b) empowers federal courts to "relieve a party . . . from a final judgment, order, or proceeding for the following reasons; . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), . . .." Although defendant SP has raised the issue of fraud on the court, it has not gone so far as to move

under Rule 60(b)(3), F.R.Civ.P., to dismiss all claims of both plaintiffs on that basis. Nevertheless, the court on its own motion may take such action as is necessary in response to fraud of a serious dimension. *Universal Oil Products Co. v. Root Ref. Co.,* 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946); *Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* 278 F.2d 798 at 801 (2d Cir. 1960). When fraud has been committed on the court there is an injury to the public and to public institutions. The court has the right and the duty to protect itself and to right the wrong, and is not dependent on the actions of the parties to seek redress for the fraud. As the Supreme Court stated in *Hazel-Atlas Glass Company v. Hartford-Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944):

"[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the 'agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

Our circuit has held that fraud on the court is "that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kupferman v. Consolidated Research and Manufacturing Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972), quoting, 7 Moore, *Federal Practice* ¶ 60.33 at p. 515 (1971 ed.) (footnote omitted). *See also, Serzysko v. Chase Manhattan Bank,* 461 F.2d 699, (2d Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972); *Martina Theatre Corp. v. Schine Chain Theatres, Inc., supra.* While in *Kupferman* the Court of Appeals declined to find such fraud as

would mandate vacating the earlier judgment in that litigation, it did so primarily because

> "it would be going too far to characterize as 'fraud on the court' [defendant's] failure to disclose an instrument [defendant] could have supposed reasonably—although, as it now appears, erroneously—to have been known to his adversary." *Kupferman, supra,* at 1081.

■ There can be no doubt that in this case, however, plaintiffs knowingly and fraudulently withheld from defendants, the court and the jury, matters material to the fair disposition of claims presented in this lawsuit which were known by no one but themselves. This constituted a serious interference with the judicial process and dismissal of all claims of the plaintiffs' seems the only appropriate course the court can take.

In the first instance, the complaints of the crew members signed by attorney William L. Schierberl make no reference to any releases, and demand recovery for each crew member without mention of money accepted in partial settlement. Having settled at least a portion of their claims for damages, the crew members could not expect to come in to court and ask to be compensated in full for these same injuries. It is outrageous that they did so. The crew members are educated, intelligent men. Two hold engineering degrees from American Universities. They were well aware that they signed releases and that a lawsuit demanding full compensation was being started in their names. Additionally, and perhaps more importantly in light of this circuit's holdings, the attorney who signed the pleadings on behalf of the plaintiff crew members was in a position to know what he was doing. Cousins, the attorney who replaced Schierberl as counsel for the crew members, admits in an unsworn statement that one of his clients informed him of the releases before the termination of the

jury trial. (Memorandum at p. 7.) Yet he took no positive step to bring these releases to the attention of the court and mentioned them only in response to the instant motions. It is thus clear that Cousins withheld material information from the court.[10] In responding to IAI's post-trial motion for summary judgment, Cousins argues at one point: "If the documents signed by the crew members were general releases, then Israel Aircraft is charged with knowing that and perpetrating a fraud upon the court, the defendants and their own employees." (Memorandum at p. 4) The court agrees with this statement as regards the actions of IAI, but it also finds that the crew members were equally guilty in not disclosing the releases.

Although IAI's failure to assert the releases in its reply to defendants' counterclaim is not by itself a fraud on the court, when viewed together with other actions taken by IAI that omission becomes part of a clear pattern of deception. It is apparent that IAI withheld the information that the crew members had signed releases in the hope that the crew members might be awarded a large verdict from which IAI could recover the amounts it had paid the crew members pursuant to the releases. Indeed, the releases would never have been disclosed but for the fact that IAI was found largely responsible for the crash and the crew members' injuries. Thus it found itself faced with potential liability of $276,250 for its share of injuries to the crew members and being required to make two payments to crew members. Only because the jury returned a verdict not to IAI's liking were the releases disclosed. Such action on IAI's part is clearly fraud on the court.

It is also relevant to the issue of IAI's fraud on the court that shortly after the verdict, IAI's attorneys demanded of the individual crew members that pursuant to the releases they reduce the amount of

---

10. Even now, with his clients' claims resting in the balance, Cousins continues to obfuscate the issues by failing to submit a single sworn affidavit from himself or any of his clients setting out the facts of these transactions in a way that might invite the court to draw some conclusion more favorable to the crew members.

their claim against SP by 65%, the amount by which IAI would be obligated to reimburse SP.[11] This demand occurred despite IAI's argument that its New York counsel did not understand the import of the releases. Clearly this is an indication that the New York counsel entirely understood the import of the releases, and merely waited until after a verdict had been handed down to reveal the releases' existence.

In sum, this court holds that both the individual crew members and IAI · have perpetrated a fraud on the court.

IAI's failure to produce the releases, Schierberl's false assurance to defendants that the entire crew members' files would be forwarded, Muscatel and Landau's false answers to written questions and Muscatel's misleading response at his deposition, are all evidence of a pattern of deception clearly meant to frustrate discovery of the releases by defendants and to deprive the defendants, court and jury of information having an important bearing on the dispute. The plaintiffs in this action had no reason to believe that the releases were known to the defendants. *Kupferman v. Consolidated Research and Manufacturing Corp.,* *supra.* In fact, the attorneys here helped to make certain the releases remained secret. Plaintiffs' behavior mandates the imposition of the extreme sanctions available under Rule 60. *Hazel-Atlas Glass Co. v. A. Hartford Empire Co., supra; cf. Kupferman v. Consolidated Research and Manufacturing Corp., supra.*

Accordingly, the complaints of the plaintiff crew members and plaintiff IAI are dismissed in their entirety by the court *sua sponte.* The cross-motions are denied as moot. Defendants SP and Rockwell are awarded their costs.

IT IS SO ORDERED.

---

11. See Dr. Hermann's affidavit, p. 6. Again, · though this is an unsworn affidavit, the court will recognize its existence. See note 8, *supra.*